IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BETTY SCOTT, §
    PLAINTIFF, §
§
VS. § CIVIL ACTION NO. 4:03-CV- 0529-Y
§
JO ANNE B. BARNHART, §
COMMISSIONER OF SOCIAL SECURITY, §
    DEFENDANT. §

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.    STATEMENT OF THE CASE

Plaintiff Betty Scott brings this action pursuant to Section 405(g) of the Social Security Act, Title 42 of the United States Code, for judicial review of a final decision of the Commissioner of Social Security.

Scott first applied for disability insurance benefits pursuant to Title II of the Social Security Act on October 22, 1997, alleging disability since May 16, 1997 due to a connective tissue disease, degenerative osteoarthritis, and mental impairments. (Tr. 51, 66). Her application was denied initially and on reconsideration. The ALJ issued an unfavorable decision on September 3, 1999, and

the Appeals Council denied Scott's request for review of that decision. (Tr. 5, 14-25). Scott filed suit on August 8, 2001 in the District Court for the Northern District of Texas, Fort Worth Division, but on motion of the Commissioner, the court reversed the Commissioner's decision and remanded the case for further administrative proceedings. *See Scott v. State*, No. 4:01-CV-672-Y (N.D. Tex. Mar.18, 2002).

In the interim, Scott filed a second application for disability insurance benefits, claiming disability since September 4, 1999. (Tr. 293, 586). That application was denied initially, but on reconsideration, Scott was found disabled beginning June 1, 2001. (Tr. 293). Scott filed a request for an administrative hearing from this decision to challenge her onset date. (Tr. 293).

The ALJ, Ward D. King, consolidated Scott's later application with his reconsideration of her earlier application and held a hearing on both applications on December 9, 2002 in Fort Worth, Texas.[1] (Tr. 289-302). Scott was represented by counsel. On January 30, 2003, the ALJ issued a partially favorable decision finding that Scott was disabled and entitled to disability insurance benefits as of December 10, 2001 when she obtained age 55, but was not disabled before that date because there were other jobs available in significant numbers in the national economy that she could have performed despite her impairments. (Tr. 289-302). That decision stands as the final decision of the Commissioner. *See* 20 C.F.R. § 404.984 (providing that ALJ decision after remand becomes final decision unless Appeals Council assumes jurisdiction of the case).

---

[1] Scott met the disability insured status requirements through December 31, 2002. (Tr. 55, 359).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 2**

B.  STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527.  Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations.  *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e).  And fifth, the impairment must prevent the claimant from doing any  work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198.  If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276

F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve. *Masterson*, 309 F.3d at 272. The court will not re-weigh the evidence, try the questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.  ISSUES

Scott alleges the following as grounds for relief:

1. Substantial evidence does not support the ALJ's assessment of Scott's mental impairments;
2. The ALJ did not adequately evaluate Scott's credibility;
3. The ALJ erred in not expressly addressing Scott's ability to maintain employment.
4. The vocational expert testimony does not support the ALJ's decision at Step 5.

D.      ADMINISTRATIVE RECORD

   1.   Medical History

Scott had a stroke in 1995, but returned to work. (Tr. 112, 122, 198). Beginning in 1996, Scott reported a variety of symptoms to her treating doctors, including neck pain, pain and weakness affecting her left side, swelling and numbness in her hands and arms, myalgia, arthralgia, fatigue, weakness, lethargy, and headaches. (Tr. 114, 122, 126-35, 182, 198-206). Physical examination and diagnostic testing were unable to confirm the etiology of Scott's complaints, but in April 1998, treating neurologist Claudio Lehmann, M.D., opined that Scott's symptoms were most consistent with Sjogren's syndrome[2] and prescribed Plaquenil, an antimalarial drug. (Tr. 174, 190). In late 1998, Scott was also diagnosed as suffering from fibromyalgia.[3] (Tr. 221, 234, 240). Lehmann opined in both 1998 and 1999 that Scott was unable to work. (Tr. 146, 172).

Scott underwent a consultative psychiatric evaluation with Tara Reddy, M.D., on January 6, 1998. (Tr. 138). Scott complained of a number of physical symptoms, as well as confusion and difficulty with her memory and concentration. Scott expressed frustration that her doctors were unable to diagnose her condition. (Tr. 138). Scott reported cooking and cleaning without assistance. She also did laundry, shopped, and handled the mail with her husband's assistance. Scott indicated that she got along well with others. (Tr. 139).

---

[2] Sjogren's syndrome is a chronic, systemic inflammatory disorder of unknown cause, characterized by dryness of the mouth, eyes and other mucous membranes and often associated with rheumatic disorders sharing certain autoimmune features, i.e., rheumatoid arthritis, systemic lupus erythematosus, or scleroderma, and in which lymphocytes infiltrate mucosal and other tissues. MERCK MANUAL OF DIAGNOSIS AND THERAPY 423 (17th ed. 1999).

[3] Fibromyalgia is a group of common nonarticular disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures. *Id.*

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 5**

On examination, Scott appeared somewhat anxious; however, her mental status examination was unremarkable. In particular, Reddy found that Scott had good concentration and memory despite her complaints. (Tr. 139). Reddy diagnosed a depressive disorder, with some deterioration in the past year, and assessed a fair prognosis with continued treatment. Reddy also assigned Scott a current Global Assessment of Functioning (GAF) score of 60 with an estimated score of 75 during the previous year.[4] (Tr. 140).

Lehmann referred Scott to psychiatrist Jennifer Heath, M.D., for evaluation in October 1998. (Tr. 214). Lehmann noticed that Scott had severe family problems and stress and thought his patient was clinically depressed. (Tr. 172). Scott's primary care physician, James Murphy, M.D., had also noted symptoms of depression. (Tr. 192). Heath examined Scott, who exhibited a depressed mood and restricted affect, but the mental status examination was unremarkable. (Tr. 214-15). Heath diagnosed major depressive disorder, recurrent, and assigned Scott a GAF score of 65-70. Heath recommended increasing Scott's use of antidepressants and instructed Scott to return in five weeks. (Tr. 215). The administrative record contains no further reports from Heath.

During the summer of 1999, Scott saw Murphy and neurologist Bill Gulledge, M.D., after she reported falling three times in one month. (Tr. 415, 422, 502-03). Murphy noted that Scott had difficulty with Romberg's testing and marked difficulty walking heel to toe, (Tr. 422), but Gulledge

---

[4] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61-70 indicates some mild symptoms, but the person is generally functioning pretty well and has some meaningful interpersonal relationships. *Id.*

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 6**

observed no focal neurological deficits or specific findings. (Tr. 502, 503).

Scott was under the care of N. Duane Purcell, M.D., from September 2000 to December 2001 for treatment of depression. (Tr. 433-50). Purcell assessed a Global Assessment of Functioning score of 55[5] in September 2000 with a high score of 65 for the previous year. Purcell completed a current mental status evaluation in October 2001, noting that Scott had mild anxiety and a depressed affect. Scott was focused on her somatic complaints and demonstrated diminished recent memory, but concentration was intact. (Tr .435-36). Purcell assigned a guarded prognosis, but indicated that Scott was stabilized on her medications as of December 2001 when he stopped treating her for insurance reasons. (Tr. 433).

Gulledge examined Scott in July 2001. Scott complained of fatigue, falling, stiffness, low back pain, and knee joint pain. (Tr. 500). On examination, Scott demonstrated decreased right arm swing, a left hand tremor, and positive cogwheeling[6] on the right greater than the left. (Tr .500). Gulledge diagnosed Parkinson's disease. Gulledge's treatment notes reflect improvement in Scott's condition in September 2001 after she started a new medication. (Tr. 498).

Scott underwent a consultative internal medicine examination with Mahe Talat Nadeem, M.D., on November 1, 2001. (Tr. 376). She reported having Parkinson's disease for four years and said she had used a cane since having a stroke in 1995. Scott's subjective complaints included

---

[5] A GAF score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000)(DSM-IV).

[6] Cogwheeling is a jerky or ratchet-like sensation felt by a physician when a patient's limb is moved around a joint. *See http://www.michaeljfox.org/parkinsons/glossary.php* (glossary provided by Michael J. Fox Foundation for Parkinson's Research).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 7**

fatigue, leg weakness, stuttering, dry mouth, poor memory, and headaches. (Tr. 376).

Nadeem performed a physical examination and noted that Scott walked slowly, but her gait and station were normal without using an assistive device. (Tr. 377). Scott was able to walk on her heels for a few steps, and was also able to perform fine and dexterous finger movement. Nadeem observed no evidence of atrophy or loss in muscle tone, and Scott had full range of motion. Nadeem performed a neurological assessment and found Scott neurologically intact except for a slight loss of strength in her right upper extremity, slight loss of her right grip compared to her left, and hand tremors. (Tr. 377-78). Nadeem opined that Scott had an unlimited ability to sit, and she could stand and walk for moderate periods and moderate distances. (Tr. 378).

Scott underwent another consultative psychiatric evaluation in March 2002 with J. Harris, M.D. (Tr. 451). Scott complained of depressive symptoms, forgetfulness, and diminished memory and concentration. (Tr. 451). She was taking antidepressants prescribed by her primary care physician, but said they provided only minimal benefit.

Scott reported that she graduated from high school and studied electronics for two years at a technical school. (Tr .452). Her daily activities included light housework, which she performed at a slow pace due to her Parkinson's disease, and watching television. (Tr. 452-53). She tended to her own bathing and grooming, but needed her husband's assistance with cooking and other cleaning tasks because of her Parkinson's disease, the residuals of a stroke, and right-sided weakness. (Tr. 454). Scott did not drive, and her husband was responsible for the family's shopping. (Tr. 454). Scott walked with a slow, shuffling gait. She used a cane and appeared to have some weakness on her right side. (Tr. 453). She demonstrated fair social skills during the

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 8**

interview and said she had a fair relationship with family members and friends. (Tr. 455).

Harris reported that Scott was cooperative, her psychomotor activity and affect were moderately low, and her mood was moderately depressed. (Tr. 453). Scott's memory, concentration, insight, and judgment appeared to be intact on examination, and Scott demonstrated the ability to think abstractly. (Tr. 453-54). Her insight and judgment were considered to be intact, and her intelligence was assessed as average. (Tr. 454).

Harris opined that Scott had moderate impairment in concentration, persistence and pace and had experienced moderate deterioration in her condition during the past year. (Tr. 455). Harris diagnosed moderate dysthmia[7] and assigned a current GAF score of 50 with a GAF score of 55 in the preceding year.[8] Harris opined that Scott's prognosis was fair from a psychiatric perspective, but she possessed some poor prognostic indicators, which included the partial deficits in her activities of daily living, a poor medication response, and exacerbating medical conditions. (Tr. 455).

2.  Administrative Hearing

Scott testified that she was born December 10, 1946 and completed high school and two years of technical school studying electronics. (Tr. 520). She last worked in May 1997 as an electronics technician for Lockheed Martin. The job required repetitive use of her hands to operate

---

[7] Dysthmia is a mood disorder characterized by depressed feelings and loss of interest or pleasure in usual activities, and in which the associated symptoms have persisted for more than two years, but are not severe enough to meet the criteria for major depression. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 529 (29th ed. 2000).

[8] A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 9**

a soldering iron, tweezers, and wire strippers. (Tr. 523-24, 525-26). She stopped working because of back pain, headaches, fatigue, family problems, and difficulty using her hands. (Tr. 524).

Vocational expert Donna Humphries attended the hearing. The ALJ asked Humphries to consider the following hypothetical:

> Assume an individual who is 55 or 56 years of age with a high school education, plus two years of technical school as Ms. Scott described and with the same work history as Ms. Scott. Assume further the individual can perform a full range of light work, except the individual can perform only occasional repetitive motions wit the bilateral hand.

(Tr. 530). Humphries testified that such a person could not perform Scott's past relevant work, nor would that work provide any transferable skills. (Tr. 530). However, there would be other work available, such as a gate guard or security guard. Both were classified as light jobs with a skilled vocational preparation level (SVP) of 3. Humphries designated the jobs as entry level positions. Humphries testified that there were 2,500 gate guard jobs in Texas, and approximately 30,000-35,000 jobs nationally. Entry level security guard positions numbered 20,000 in Texas and approximately 300,000 jobs nationally. There were also unskilled machine tending positions that would fall within the parameters of the ALJ's hypothetical, with approximately 7,000 jobs in Texas and 150,000 nationally. (Tr. 531). Humphries also testified that there were janitorial jobs that would be suitable (30,000 such jobs in Texas and 400,000 jobs nationally), as well as light, unskilled positions for general office workers (30,000 jobs available in Texas and 350,000 nationally) and fast food workers (150,000 jobs in Texas and 1.5 million jobs nationally). (Tr. 541-42).

The ALJ asked Humphries to clarify how a job classified as carrying an SVP level of 3, which signified a semi-skilled job taking one to three months to learn, could also be an entry level

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 10**

position. Humphries explained that she considered an entry level position to be one requiring no prior skills or knowledge, and testified that both guard positions met this criteria in her experience. She clarified that the security guard positions she identified were unarmed jobs not requiring a person commissioned to carry a gun. (Tr. 532). Humphries also testified that some machine tending positions could require repetitive hand motion, but testified that the machine tending jobs that she had identified and counted would not require repetitive bilateral hand motion. (Tr. 533).

In response to questions from counsel, Humphries testified that she would not expect a moderate concentration deficit to affect the jobs she had identified, which were somewhat routine and repetitive. (Tr. 535). However, the worker would need to stay on task, remember work instructions, and perform consistently and competitively. (Tr. 535-36, 539, 543).

    3.    ALJ Decision

The ALJ found that Scott had not engaged in substantial gainful activity since her alleged onset date of May 16, 1997. The ALJ also found that Scott had the following severe impairments: fibromyalgia, Sjogren's syndrome, and Parkinson's disease. However, Scott's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the disability regulations. (Tr. 294). Instead, the ALJ found that Scott retained the residual functional capacity (RFC) for a modified range of light work accommodating her need to avoid more than occasional repetitive motion with her upper extremities bilaterally. (Tr. 299). Based on the Medical-Vocational Guidelines and the vocational expert's testimony, the ALJ found Scott disabled as of her fifty-fifth birthday on December 10, 2001, but not before that date because there was other work available in significant numbers that Scott could have performed. (Tr. 300-01). *See generally* 20 C.F.R. Part

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 11**

404, Subpart P, App. 2, Rule 202.06.

D.   DISCUSSION

  1.   Mental Impairments

Scott asserts that the ALJ did not explain the weight he assigned to the medical source opinions evaluating Scott's mental functioning or adequately explain why he found that Scott had no severe mental impairment. Scott asserts that both consultative examiners found Scott to be moderately impaired in her functioning and the state agency medical consultants similarly found that Scott had moderate degrees of impairment in several work-related areas.

The ALJ reviewed the results of Scott's consultative examinations with Reddy in January 1998 and Harris in March 2002, her treatment history with Duane Purcell from September 2000 to December 2001, and her evaluation by Jennifer Heath in October 1998. (Tr. 296-97). The ALJ ultimately found that Scott's mental impairment was not severe because her depression had resulted in no more than mild limitation in her activities of daily living, social functioning, and concentration, persistence, and pace, and there were no episodes of decompensation attributable to Scott's mental condition. *See* 20 C.F.R. § 404.1520a(d) (stating that mental impairment generally not severe if results in no or only mild limitation in the recognized areas of mental functioning). The ALJ specifically found that Scott's limitations in her daily activities and in her persistence and pace were secondary to her physical impairments, not her depression. (Tr. 297). He also noted that, despite Scott's subjective complaints, her concentration had been excellent every time she was tested.

Although Scott relies on Reddy's report as an indicator of moderate mental impairment, Reddy actually reported that Scott's mental evaluation was unremarkable and assessed GAF scores that indicated mild symptoms only. (Tr. 296). Consulting examiner Harris did opine that Scott was

moderately impaired in her concentration, persistence and pace, and had experienced moderate deterioration in her condition; however, the ALJ indicated that Harris's conclusions were at odds with the results of the mental status examination, which showed Scott's memory, concentration, insight, and judgment to be intact and she possessed the ability to think abstractly.[9] (Tr. 296-97).

Scott contends that existence of a severe mental impairment is supported by the findings of the state agency medical consultants who evaluated her condition. The findings made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence (from nonexamining sources) at the administrative hearing and Appeals Council levels of review. 20 C.F.R. §404.1527(f); SOCIAL SECURITY RULING 96-6p. The administrative law judge and the Appeals Council are not bound by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions. SOCIAL SECURITY RULING 96-6p.

The ALJ acknowledged that he had a duty to consider the opinions offered by the state agency medical consultants and concurred with their opinions to the extent they found Scott had no *per se* disabling listed impairment and that she retained the ability to perform light work, but he specifically did not adopt the state agency medical consultants' opinion that Scott's depression was severe.[10] (Tr. 295). The ALJ further provided a thorough review and summary of Scott's mental

---

[9] The Commissioner also notes that Harris's consultative examination was performed during a period in which Scott was considered disabled.

[10] The ALJ was referring to the findings of the state agency medical consultants who reviewed Scott's second application for disability insurance benefits. The state agency medical consultants who reviewed Scott's 1997 application for benefits found she had no severe mental impairment. (Tr. 162).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 14**

health treatment history and the results of the multiple mental status evaluations from treating and examining sources and adequately explained why he found Scott's depression was not a severe impairment. (Tr. 296-97).

The ALJ did not err in his determination that Scott had no severe mental impairment, and substantial evidence supports that decision.

2.     Credibility Assessment

Scott contends that the ALJ did not adequately explain why he found Scott's complaints of fatigue and other subjective symptoms were not wholly credible.

In evaluating a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms. 20 C.F.R. § 404.1529(b); SOCIAL SECURITY RULING 96-7p. Once the impairment is found, the ALJ evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529. A claimant's testimony about her symptoms must be consistent with the objective medical evidence and other available evidence. *Id.* In all cases in which pain or other symptoms are alleged, the administrative decision must contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's own observations. SOCIAL SECURITY RULING 95-5p. A claimant's statements as to pain and other symptoms is not alone conclusive evidence of disability, but must be accompanied by medical signs and findings of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged and that would lead to the conclusion that an individual is disabled. 42 U.S.C.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 15**

§423(d)(5)(A). The ALJ reviewed Scott's testimony, the consultative examination reports, and Scott's treatment history. The ALJ agreed that Scott had underlying impairments that could be expected to produce the symptoms alleged, but found Scott's subjective complaints not entirely credible to the extent she alleged an inability to engage in any work activity. (Tr. 297). He recognized that Scott experienced some degree of pain and functional loss, but concluded that even moderate levels of pain and functional loss were not incompatible with some level of sustained work activity. (Tr. 298). The ALJ further found that the objective findings on physical examination by treating and examining sources did not support the degree of limitation alleged, and in particular, Scott's complaints of significant (disabling) fatigue were unsupported. (Tr. 298).

Although Scott might prefer a more thorough explanation, the ALJ sufficiently articulated his basis for finding Scott's subjective complaints not wholly credible, and substantial evidence supports that determination.

3.   Maintaining Employment

Scott contends that the ALJ erred in failing to make an express determination that Scott could maintain employment on a sustained basis given her impairments.

Social Security Ruling 96-8p defines residual functional capacity (RFC) as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SOCIAL SECURITY RULING 96-8p. *See also* 20 C.F.R. § 404.1545(b). A regular and continuing basis is considered eight hours a day, five days a week, or an equivalent work schedule. SOCIAL SECURITY RULING 96-8p. The Fifth Circuit has adopted the principles underlying Ruling 96-8p and decided that, in assessing RFC, the adjudicator must discuss

the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).

A finding that a claimant can perform substantial gainful activity requires more than a determination that the claimant can find work and physically perform the job: There must be a determination that the claimant could hold whatever job he obtains for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002). *See also Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). The ALJ is not required to make express or separate findings when the evidence does not raise a question about a claimant's abilities to both obtain and maintain employment. *See Dunbar v. Barnhart*, 330 F.3d 670 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 621 (5th Cir. 2003).

Contrary to Scott's assertions, the ALJ specifically found that Scott could obtain, perform, and maintain a limited range of light work. (Tr. 299). Moreover, Scott did not and does not assert that her condition only periodically precluded her from working nor does the medical evidence establish that Scott was intermittently unable to maintain employment during the relevant 1997-2001 time period. There is also no indication that the ALJ did not appreciate that an ability to maintain employment is inherent in the definition of residual functional capacity. Scott's complaints regarding the ALJ's failure to make an express determination regarding her ability to work on a sustained basis are meritless.

4.     Vocational Expert Testimony

Scott asserts that the ALJ's determination that she could perform the job of gate guard or security guard is not supported by substantial evidence. Scott complains that the <u>Dictionary of</u>

Occupational Titles describes both jobs as semi-skilled positions, but the ALJ failed to develop the record regarding Scott's possession of the transferable skills necessary to perform either job.[11]

The ALJ noted that the jobs of gate guard and security guard were classified as requiring a skilled vocational preparation (SVP) level of 3, which was considered semi-skilled work, and specifically questioned the vocational expert about her testimony that the jobs were essentially "entry level" positions. (Tr. 300, 531). The vocational expert explained that the SVP level simply meant that each job took one to three months to learn, but no prior skills or experience were required for either job. She also testified that she had placed individuals with no prior skills or training into unarmed security guard positions, where the they received on-the-job training. (Tr. 531-33). Moreover, the vocational expert identified four other types of light work, including unskilled positions, that a person with the work-related restrictions assigned by the ALJ could still perform.

Substantial evidence supports the ALJ's determination that, before December 10, 2001, Scott could perform the jobs of gate guard and security guard, as well as other positions available in significant numbers in the national and Texas economies.

RECOMMENDATION

It is recommended that the decision of the Commissioner be affirmed.

---

[11] Scott's argument is somewhat disingenuous because a decisive factor in the ALJ's determination that she was disabled as of age 55 was her lack of transferable work skills. (Tr. 300-01). *See generally* 20 C.F.R. Part 404, Subpart P, App. 2, Rule 202.06.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 18**

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until May 2, 2005. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until May 2, 2005 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the

**Findings, Conclusions and Recommendation of the United States Magistrate Judge–Page 19**

filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED APRIL  7 , 2005.


   /s/    Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE